Ned **GLOVER, Jobmate of South Carolina and Jobmate of Georgia, Inc.; Henry Lipsey, Jobmate of Alabama, Inc.; and Harry Reed, HSR & Associates, Inc., Plaintiffs/Counterdefendants,**

v.

**JOBMATE OF MISSISSIPPI, INC., Jobmate Leased Employees Trust, Harold Vandevender, Jobmate Affiliated Companies, Inc., and J. Lee McCarty, Jr., Benefit Providers, Inc. and Madison Leasing and Consultants, Inc., Defendants/Counterclaimants.**

Civ. A. No. J92–0568(L)(N).

United States District Court, S.D. Mississippi, Jackson Division.

March 23, 1995.

John I. Donaldson, Stephen M. Maloney, Allred & Donaldson, Jackson, MS, for plaintiffs.

B. Kendall Griffin, Jackson, MS, for defendants.

### MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

The plaintiffs in this case filed a motion for summary judgment against defendants Lee McCarty, Jr. and Benefit Providers, Inc., in response to which McCarty and Benefit Providers filed a cross-motion for summary judgment on the merits. Thereafter, these defendants filed a supplemental motion for summary judgment in which they contend that the court lacks subject matter jurisdiction. For the reasons that follow, defendants' supplemental motion for summary judgment will be denied so that plaintiffs may be given an opportunity to amend their complaint in an effort to state a cognizable claim within the court's jurisdiction. However, plaintiffs' motion for summary judgment and defendants' cross-motion for summary judgment on the merits, as those motions are presently framed, are due to be denied. Should plaintiffs elect to proceed in this

cause with the filing of an amended complaint, the parties will be given adequate time to file such dispositive motions as they deem appropriate in light of any such amended pleading.

## I. BACKGROUND

The individual plaintiffs in this cause, Ned Glover, Henry Lipsey and Harry Reed, own what they characterize as employee leasing companies which are also plaintiffs herein. Glover owns Jobmate of South Carolina, Inc. and Jobmate of Georgia, Inc.; Lipsey owns Jobmate of Alabama, Inc.; and Reed owns HSR & Associates, Inc. These companies are franchisees of Jobmate of Mississippi, Inc. (Jobmate), also an employee leasing company which, during the period of its operation, franchised a number of such companies, including the corporate plaintiffs. So far as the court can discern from the pleadings and exhibits, these companies operated in the following manner. They solicited small businesses, primarily those with between one and one hundred employees, to contract to receive a package of administrative services and benefits provided by the franchisees.[1] Briefly, in exchange for the subscribing employer's payment of a one-time subscription fee of $25 per employee and a monthly per-employee fee of $40, the Jobmate franchisee agreed to assume the employer's administrative functions of preparing the payroll, carrying workers' compensation insurance, and preparing and filing the various government and tax forms for social security and federal and state unemployment taxes. Prior to employees' paychecks being delivered by the leasing firm, the subscribing employer, in accordance with an invoice prepared by the leasing company, remitted to the leasing company a "service fee," consisting of the amount necessary to cover the employees' wages, social security taxes, unemployment taxes and workers' compensation premiums, along with the $40 per-employee fee.[2]

In addition to these administrative services, the Jobmate firms provided medical and health insurance coverage for their clients' employees pursuant to self-funded multiple employer trusts established by Jobmate of Mississippi. Initially, this coverage was provided pursuant to what was denominated the Jobmate of Mississippi, Inc. Leased Employees Trust, referred to by the parties as "Trust 1," which became effective February 1, 1986 and purported to provide health and medical coverage for participating employees and their eligible dependents. Subsequently, however, Jobmate formed a second trust, the Jobmate Affiliated Companies, Inc. Leased Employees Benefit Plan & Trust, referred to as "Trust 2," which became effective September 16, 1991. Defendant Lee McCarty was hired as plan administrator for Trust 2. Trust 1 was not formally terminated or liquidated when Trust 2 was formed, but the franchisees' clients whose employees' coverage had formerly been provided under Trust 1 "adopted" Trust 2. Thereafter, claims for expenses incurred by participants subsequent to the activation of Trust 2 were submitted and paid under Trust 2. However, claims continued to be submitted under Trust 1 for expenses incurred prior to September 15, 1991. McCarty, upon assuming his duties as Trust 2 administrator, learned of these claims, and further discovered that there were insufficient funds in Trust 1 to pay those claims. He therefore used Trust 2 funds to pay claims that were properly payable under Trust 1.[3]

1. These businesses will hereafter be referred to as subscribing employers or clients.

2. Jobmate and its franchisees also purported to lease employees to their clients; the contracts entered between the Jobmate franchisees and their clients refer to the leasing companies as the employers and the paperwork prepared by the leasing companies undoubtedly identifies the leasing companies as the employers. However, while the parties' proof respecting the relationship between the franchisees, clients and employees is scant, it is apparent that the workers were not employed by the leasing companies according to traditional common-law criteria. See infra at 930–931. Thus, while on paper, the workers may have been the franchisees' employees, in reality, they were employed by the franchisees' clients. See id.

3. The parties have stipulated that from September 16, 1991 through December 31, 1991, claim payments totaling $213,562.87 were made by Trust 2 for claims incurred prior to September 16, 1991.

The plaintiffs filed this action in September 1992 under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* (ERISA), alleging that Trust 2 is an ERISA employee welfare benefit plan governed by ERISA and charging that McCarty, by paying Trust 1 claims with Trust 2 funds, breached his fiduciary duties to them as participants and "parties in interest" under Trust 2.[4] They demanded, *inter alia*, that McCarty be required to make good all the losses to Trust 2 caused by his alleged unauthorized payment of those claims.

In their motion for summary judgment, plaintiffs, identifying themselves as "beneficiaries and individual plan participants in Trust 2," sought to demonstrate McCarty's breach of his fiduciary undertaking with respect to Trust 2 (hereafter Trust 2 or the Jobmate plan), and to prove the amount of the losses to the plan caused by his alleged breach. Initially, McCarty responded to plaintiffs' motion on the merits, denying any breach of duty and seeking, by cross-motion, judgment in his favor as a matter of law.[5] Subsequently, though, he filed a supplemental motion urging that Trust 2 is not an ERISA plan and that consequently, this court lacks jurisdiction. In their response to McCarty's supplemental motion, plaintiffs maintained that the Jobmate plan, or Trust 2, was, in fact, an ERISA plan. They pointed out, though, that the court has diversity jurisdiction in any event. Following a conference with counsel for these parties, the court requested additional briefing on the issues raised by McCarty's supplemental motion. Those matters have now been fully briefed and the court finds and concludes as follows.

## II. ANALYSIS

A plan, to come within the coverage of ERISA, must be an "employee benefit plan" that is "established or maintained—(1) by any employer engaged in commerce or in any industry or activity affecting commerce; or (2) by any employee organization or organizations representing employers engaged in commerce or in any industry or activity affecting commerce; or (3) by both." 29 U.S.C. § 1003(a). One type of "employee benefit plan" that can come under ERISA is an employee welfare benefit plan, which is defined by ERISA as "any plan, fund or program . . . established or maintained by an employer or by an employee organization, or by both, for the purpose of providing its participants or their beneficiaries, through the purchase of insurance or otherwise [certain benefits, including medical, surgical or hospital care or benefits]." 29 U.S.C. § 1002(1). ERISA defines "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity." 29 U.S.C. § 1002(5). ERISA also recognizes what is called a multiple employer welfare arrangement, or MEWA, which permits employees of participating employers to obtain health insurance at more favorable rates than might otherwise be available. *See* 29 U.S.C. § 1002(40)(A) (defining MEWA as "employee welfare benefit plan, or other arrangement" which is "established or maintained for the purpose of offering or providing [medical, surgical or hospital care or benefits] to the employees of two or more employers (including one or more self-employed individuals), or to their beneficiaries.").

In their initial brief on the jurisdiction issue, the plaintiffs submitted that the Jobmate plan, which the parties agree was a MEWA, was "in fact an ERISA plan." They argued, more particularly, that Jobmate,

---

4. In addition to McCarty and Benefit Providers, plaintiffs alleged claims additional against Jobmate of Mississippi, Inc., its owner Harold Vandevender, Trust 1, and Madison Leasing and Consultants, Inc., another company owned by Vandevender which provided claims processing services for Trust 1. Since that time, plaintiffs have agreed to the dismissal of these additional defendants, apparently in recognition of the fact that these parties are either insolvent or lack the funds to satisfy any judgment that might be obtained against them.

5. Defendant Benefit Providers, a company formed by McCarty to perform a claims processing function relative to Trust 2, also moved for summary judgment. Plaintiffs confessed that portion of the motion.

which established and maintained the Jobmate plan and was the plan sponsor, qualified as an ERISA employer because it acted indirectly in the interest of employers, namely the franchisees, in relation to the plan. They took the position, in other words, that the Jobmate franchisees, which had adopted the plan, were employers in whose interest Jobmate acted. It now appears, based on their more recent memorandum, that plaintiffs have abandoned their original position. They no longer argue that the Jobmate plan itself constitutes an ERISA plan, or even that Jobmate maintained, established or sponsored the plan. Instead, they now submit that each individual franchisee established and maintained a separate ERISA plan and that each acted as plan sponsor of its individual plan. Moreover, they no longer claim that the franchisees acted directly as employers but instead assert that they acted indirectly in the interest of their clients, who were the actual, direct employers. In the court's opinion, regardless of which position the franchisees wish to maintain, their arguments are without merit.

### (A) Did Jobmate of Mississippi establish and maintain an employee welfare benefit plan?

■■■ In *MDPhysicians & Associates v. State Board of Insurance*, 957 F.2d 178 (5th Cir.1992), the Fifth Circuit explained that while some MEWA's are employee welfare benefit plans, others are not. Those that are not do not qualify as ERISA plans and hence are not governed by ERISA. *See id.* 957 F.2d at 181 ("Only MEWAs that also constitute statutory [employee welfare benefit plans] are governed by and regulated under federal law—ERISA."). If the question for the court is whether Trust 2, the Jobmate plan, is an employee welfare benefit plan, as

first contended by the plaintiffs, the answer is obviously no. To reiterate, in order to be an employee welfare benefit plan, the plan must be established or maintained by an employer, an employee organization, or both. Jobmate is not an "employee organization." And while the trust documents refer to Jobmate as the plan sponsor and employer,[6] Jobmate does not fit ERISA's definition of "employer." That is, Jobmate did not act directly as an employer,[7] nor did it act indirectly in the interest of an employer in relation to the plan. The plaintiffs' original argument, that Jobmate acted indirectly in the interest of employers in relation to the Jobmate plan, was premised on the existence of an employer/employee relationship between the franchisees and the employees who participated in the Jobmate plan. This position was patently erroneous. In *Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992), the Supreme Court held that traditional agency criteria are to be used to determine whether someone is an "employee" under ERISA.[8]

"In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is

---

6. The plan states, "The term 'Employer' means Jobmate ... and any and all subsidiary and affiliated entities listed in Sec. 1 of the Summary Plan Description...." The Summary Plan Description identifies Jobmate as the plan sponsor and states that persons are eligible for participation following "thirty (30) days full-time employment by the Plan Sponsor or Affiliated Employer who has adopted this Plan." Neither the plan nor the summary plan description identifies any "affiliated entities," just as neither defines the term "[a]ffiliated [e]mployer."

7. No one has contended that Jobmate acted directly as an employer in relation to the plan.

8. ERISA defines "employee" as "an individual employed by an employer." The Court, finding that this "nominal definition" of "employee" is "completely circular and explains nothing," decided to "adopt a common-law test for determining who qualifies as an 'employee' under ERISA." *Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318, 323, 112 S.Ct. 1344, 1349, 117 L.Ed.2d 581 (1992).

part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party."

*Darden*, 503 U.S. at 323–24, 112 S.Ct. at 1349 (quoting *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)). The factor that is determinative of whether someone is an employer is whether that person has "the right to control the manner and means by which the product is accomplished." *Id.* In the case at bar, the proof is uncontroverted that the individual franchisees had no control over their clients' employees.[9] Consistent with *Darden*, then, the franchisees' clients, and not the franchisees themselves, were the actual, direct employers.[10] Accordingly, even if it could be said that Jobmate acted in the interest of its franchisees in relation to the plan, since the franchisees were not the actual employers, Jobmate was not an ERISA employer.[11]

The plaintiffs have not contended that Jobmate acted indirectly in the interest of the subscribing employers in relation to the plan. However, the fact that Jobmate had no relationship whatsoever with those employers would preclude any such finding. It must be concluded, therefore, that Trust 2 is not a employee welfare benefit plan. *See Donovan v. Dillingham*, 688 F.2d 1367, 1375 (11th Cir.1982) (multiple employer trust that provided group insurance to employers too small to qualify for group rates on their own was not itself an employee welfare benefit plan); *Taggart Corp. v. Life & Health Benefits Admin.*, 617 F.2d 1208 (5th Cir.1980), *cert. denied sub nom. Taggart Corp. v. Efros*, 450

U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981) (multiple employer trust did not qualify as employee welfare benefit plan since it was neither established nor maintained by a statutory "employer" or "employee organization").

**(B) Did the individual franchisees establish and maintain an employee welfare benefit plan?**

■ The position plaintiffs now espouse is that while Trust 2 itself is not an ERISA plan, each individual franchisee established and maintained a separate employee welfare benefit plan and in so doing, acted indirectly in the interest of their clients, the subscribing employers. In light of the Fifth Circuit's opinion in *MDPhysicians*, the court rejects plaintiffs' contention in this regard.

In *MDPhysicians*, an independent practice association of over one hundred doctors which contracted the services of its members to health care providers, formed an entity called MDP and created the MDP Employee Benefit Plan. MDP served as the plan administrator and funded the plan through a trust established by MDP and three doctors. MDP advertised the plan to Texas employers, and more than one hundred disparate employers signed up for the MDP plan by executing an application and subscription agreement, paying a one-time fee, and paying a small, monthly, per-employee fee. MDP administered the plan to provide medical and health benefits to the subscribing employers' employees, and employees who needed medical care or treatment could either obtain the treatment from a network medical service provider (i.e., one of the physician members of MDPhysicians) and pay 10% of the cost, or

---

**9.** The other factors identified in *Darden* also favor a finding that the plan participants were not employees of the franchisees. However, since this aspect of the case no longer appears to be the subject of contention between the parties, the court considers it unnecessary to address this issue further.

**10.** The issue in *Darden* was whether an individual was an independent contractor or was, instead, an employee who thus qualified to participate in an ERISA plan; the issue was not whether the individual was employed by one or another entity. However, the Court's recognition of common-law principles to determine one's status as an employee would also seem to apply to the

question whether a person acts "directly as an employer."

**11.** The court would in any event note that Jobmate's primary, if not exclusive interest was to profit from the sale of Jobmate franchises. In establishing the plan and offering it to its franchisees, Jobmate did not act in the interest of the franchisees or of their clients but rather acted in its own interest. Jobmate's providing a plan of medical insurance that its franchisees could offer prospective clients as part of their package of products and services was a feature that contributed significantly to the marketability of the franchises.

they could get treatment elsewhere and pay 20% of the cost.

Based on these facts, the Fifth Circuit concluded that the MDP plan which, like the Jobmate plan, was a MEWA, was not an employee welfare benefit plan under ERISA because MDP was not a direct employer and did not act indirectly for the subscribing employers in relation to the plan; MDP, which provided the medical and health benefits, had no relationship with the employees of the subscribing employers, and the subscribing employers, the entities with economic and representational ties to the individuals who benefitted from the MDP plan, were not involved in the establishment of the plan. In resolving this issue, the court declined to "formulate or ascertain a comprehensive, definitive test for determining whether an entity constitutes an 'employer' for the purposes of ERISA," 957 F.2d at 184, and instead noted a number of factors which suggested to the court that the entity there involved, MDP, was not a statutory employer under ERISA. First, the court pointed out that

the MDP Plan, as a MEWA, offered or provided certain medical and health benefits to the Employees of the multiple Subscribing Employers.... But ... the Subscribing Employers did not establish the MDP Plan, nor did they "participate in the day-to-day operation or administration of the plan"; rather, *MDP* established and maintained the MDP Plan, at least in terms of the Plan's status as a "multiple employer welfare arrangement." *MDPhysicians [& Associates v. Wrotenbery]*, 762 F.Supp. [695] at 698; [ (N.D.Tex.1991) ]; 29 U.S.C. § 1002(40)(A) (defining a MEWA as an [employee welfare benefit plan] or "any other arrangement ... established or maintained" to offer or provide certain benefits to employees of two or more employers).

*MDPhysicians*, 957 F.2d at 185 (additional citations omitted). The question, then, according to the court, was whether MDP established and maintained the plan "in the interests of" its clients, the subscribing employers. *Id.* Likewise, the question here is whether the franchisees established and/or

maintained the Jobmate plan "in the interests of" their clients.

In this regard, the court in *MDPhysicians* observed that Congress, as evidenced by the Activity Report of the Committee on Education and Labor issued shortly after passage of ERISA, did not intend that ERISA apply to entrepreneurial ventures whose purpose was merely to sell insurance products. *Id.* at 184. That Report recited:

"[C]ertain entrepreneurs have undertaken to market insurance products to employers and employees at large, claiming these products to be ERISA covered plans. For instance, persons whose primary interest is profiting from the provision of administrative services are establishing insurance companies and related enterprises. The entrepreneur will then argue that [its] enterprise is an ERISA benefit plan which is protected, under ERISA's preemption provision, from state regulation.... [W]e are of the opinion that these programs are not 'employee benefit plans'.... [T]hese plans are established and maintained by entrepreneurs for the purpose of marketing insurance products or services to others. They are not established or maintained by the appropriate parties to confer ERISA jurisdiction.... They are no more ERISA plans than is any other insurance policy sold to an employee benefit plan.

. . . . .

[W]e do not believe that the statute and legislative history will support the inclusion of what amounts to commercial products within the umbrella of the ['employee benefit plan'] definition.... [T]o be properly characterized as an ERISA employee benefit plan, a plan must satisfy the definitional requirement of section 3(3)[, which defines 'employee benefit plan',] in both form and substance.

*MDPhysicians*, 957 F.2d at 184 (quoting Activity Report, H.R.Rep. No. 1785, 94th Cong., 2d Sess. 48 (1977)). With this in mind, the court concluded:

MDP did not act indirectly "for the [Subscribing Employers]" in relation to the MDP Plan. Rather, it acted *for itself* in relation to the MDP Plan. MDP adver-

tised the MDP Plan as a "commercial product" to "employers at large" in the Texas panhandle. House Report 1785. The record indicates that MDP sometimes used insurance agents to sell the Plan to employers for a commission. MDP established, marketed, and maintained the MDP Plan to enable the physician practice association, MDP Physicians, to compete with other exclusive providers of medical and health services. MDP's "primary interest" was in profiting from the provision of medical and administrative services. *Id.* . . . To allow an entrepreneurial venture to qualify as an "employer" by establishing and maintaining a multiple employer welfare arrangement without input by the employers who subscribe to the plan would twist the language of the statute and defeat the purposes of Congress. *See [Taggart Corp. v. Life & Health Benefits Admin.,* 617 F.2d 1208, 1210 (5th Cir.1980) ], *cited in Gahn v. Allstate Life Ins. Co.,* 926 F.2d 1449, 1452 (5th Cir.1991).

*Id.* at 185.

Plaintiffs argue that they, as franchisees, acted indirectly for their clients in relation to the MDP Plan. It is apparent to the court, however, that the franchisees, as did MDP in *MDPhysicians,* acted for themselves in relation to the Jobmate plan in that their "primary interest" was in profiting from the provision of their package of services and benefits to subscribing employers. The parties have stipulated that the franchisees did not make any direct profit by providing health care benefits to their clients' employees; the exact amount paid by the clients and/or their workers for these benefits was remitted by the franchisees to Jobmate. However, it is undisputed that the ability of

the client companies to obtain health insurance was a key selling point that enabled the franchisees to sign up clients and thereby earn a fee. In fact, the plaintiffs acknowledge that the franchisees' ability to provide health care benefits was an integral part of their business, without which they were at immediate risk of going out of business.[12] Furthermore, as in *MDPhysicians,* the Jobmate franchisees marketed their services and the plan and solicited disparate businesses to sign up using various means, including direct contact and advertising.[13]

In arriving at its conclusion that MDP acted for itself, and not indirectly for its clients, the court in *MDPhysicians* considered two factors dispositive: (1) other than the provision of medical and health benefits under the plan, MDP, the provider of benefits, had no relationship to the recipient of those benefits, its clients' employees, *MDPhysicians,* 957 F.2d at 185; and (2) the subscribing employers, the entities that did have a relationship to the benefit recipients, were not involved in the establishment or maintenance of the plan, *id.* at 186.

On the first of these points, the court read the pertinent ERISA definitions as requiring that " 'the entity that maintains the plan and the individuals that benefit from the plan [be] tied by a common economic or representation interest, *unrelated to the provision of benefits.*' " *Id.* (quoting *Wisconsin Educ. Assoc. Ins. Trust v. Iowa State Bd.,* 804 F.2d 1059, 1063 (8th Cir.1986)). The most common example, the court said, is "the relationship between employees and a person acting directly as their employer." *Id.* at 186. However, "[t]he representational link between employees and an association of employers in

---

**12.** The importance of these health care benefits to the subscribing employers, and hence to the franchisees, was explained by plaintiff Reed, owner of HSR & Associates, who stated in his deposition:

> Most of these clients couldn't get it [medical coverage] I mean, you know, from Blue Cross, they couldn't get decent rates from those people. They had to get them as individuals basically ... well, I mean some of them couldn't buy medical coverage, and if you could just provide them with medical coverage, you know, that was better than they could do anywhere else, because most of them were small

companies, and nobody wants to deal with them.

Lipsey, owner of Jobmate of Alabama, Inc., also confirmed that one of the selling points for the franchisee was the health insurance plan.

**13.** The parties have stipulated that the franchisees were separate business ventures and that each used its own methods for soliciting clients. However, they have stipulated that clients were solicited primarily by direct contact, though some advertising was done by the franchisees to solicit clients.

the same industry who establish a trust for the benefit of those employees also supplies the requisite connection." *Id.* The court explained:

> This special relationship protects the employee, who can rely on the "person acting directly as an employer" or the person "acting indirectly in the interest of" that employer to represent the employee's interests relating to the provision of benefits. . . .
>
> [T]he "relationship between the plan sponsor and the participants . . . distinguishes an employee welfare benefit arrangement from other health insurance arrangements. . . . Absent the protective nexus between the entity providing the benefits and the individuals receiving the benefits, we cannot consider MDP a 'group or association of employers' acting indirectly for the Subscribing Employers in relation to the MDP Plan." *Id.*

*Id.* at 186 (citations omitted).

The plaintiffs submit that in this case, as contrasted with *MDPhysicians,* "each franchisee had a very close relationship with the employees of the subscribing employers," because "the subscribing employers . . . entered into a contractual relationship with the respective franchisee company." [14] This argument overlooks the fact that the Fifth Circuit concluded in *MDPhysicians* that there was "no relationship" between MDP, the plan sponsor, and the employees of the subscribing employers, despite the fact that the subscribing employers had signed up for the MDP plan by executing an application and subscription agreement; that is to say, the court found the requisite relationship between MDP and the employees was lacking even though, in the words of the plaintiffs here, "there was a contractual relationship between the plan sponsor . . . and the subscribing employer (client company)."

Plaintiffs further reason that the required relationship is established here by virtue of the fact that the franchisees' had an economic interest in providing satisfactory medical and health benefit coverage for their clients' employees.[15] It can easily be seen, though, that MDP also had an economic interest in protecting the interest of its clients' employees, yet the Fifth Circuit obviously did not consider this a sufficient "representational link" to deem MDP a statutory employer under ERISA; MDP's "primary interest" was not in protecting the interests of its clients' employees, but rather was "in profiting from the provision of medical and administrative services." *Id.* at 185. Here, too, the franchisees' "primary interest" was in profiting from the provision of their package of services and benefits to subscribing employers. That the employees, as the recipients of the insurance coverage, may have received some incidental benefit from the franchisees' efforts does not mean that the franchisees were *acting in the interest of the* employers, as contemplated by ERISA. In summary, therefore, in the case at bar, as in *MDPhysicians,* there was no relationship between the franchisees and the participating employees other than the provision of medical benefits under the Jobmate plan.[16]

The other factor considered pertinent by the court in *MDPhysicians* was that "[t]he Subscribing Employers, the entities with economic and representational ties to the individuals that benefitted from the MDP Plan, were not involved in the establishment or maintenance of the MDP Plan." *Id.* at 186. This is also true in the case at bar. The franchisees' clients, who, like the subscribing employers in *MDPhysicians* were the entities with economic and representational ties

---

**14.** Indeed, plaintiffs argue, "[i]t would be difficult to establish a closer relationship between a subscribing employer and a plan sponsor (franchisee) then (sic) that established by the contractual relationship between the plan sponsor (franchisee) and the subscribing employer (client company)."

**15.** They argue that they had to provide satisfactory health care coverage to stay in business. *See supra* p. 932–933.

**16.** There is a difference between this case and *MDPhysicians* in that MDP's interest was in profiting not only from the provision of administrative services but also from the provision of medical services. *MDPhysicians,* 957 F.2d at 185. What is significant, though, is that the plan provider's interest in both cases is in making a profit through providing medical and health benefits coverage.

to their employees, the plan participants, were not involved in establishing or maintaining the plan. It follows, therefore, that here, as in *MDPhysicians,* the franchisees "did not act as a 'group or association of employers' in the interest of the Subscribing Employers in relation to the [Jobmate] Plan." *Id.*

In a case quite similar to this one, *State of Texas v. Alliance Leasing Corp.,* 797 F.Supp. 542 (N.D.Tex.1992), the court reached the same conclusion. The situation presented in *Alliance Leasing* was described by the court as follows:

> Alliance is comprised of for-profit Texas corporations who established, maintain and control the Alliance Group Health Plan [and other benefit plans]. ... Alliance market their benefit plans to relatively small employers in Texas through the use of staff leasing agreements with employers. Under these agreements, the employer purports to "fire" its employees, who are instantly "hired" by Alliance. The employees are then instantly "leased" back to the original employer, who is now called the "client company." The "client companies" continue to provide all the workers' facilities and tools, to supervise the workers with the same personnel, and to exercise actual control over the workers' job performance. When "client companies" terminate their Alliance health benefits, the workers continue working at the "client companies'" premises.
>
> Shortly before the workers' paychecks are due, the client company sends funds to Alliance to pay the wages, health and other benefits provided by Alliance. Alliance then sends the workers their paychecks, files the various government and tax forms, and provides the health and other benefits. In sum, ... Alliance does not exercise control and supervision over the workers as an employer would. Instead, the "client companies" direct how the work will be performed, provide the facilities and equipment, train the workers, decide their benefits, and hire and fire the employees.

*Id.* at 545. The court held that Alliance did not act directly as an employer in relation to an employee benefit plan, since "it is the existence of a noncommercial, employment-based relationship between the plan sponsor and the participant that distinguishes an ERISA-covered employee welfare benefit plan from simple health insurance...." *Id.* at 546. The court further held that "Alliance did not act indirectly in the interests of the 'client companies'; rather it acted for itself in relation to the Plans. Alliance is merely an entrepreneurial venture formed to market the benefit plans to unrelated employers and it's [sic] 'primary interest' is to profit from such activity." *Id.* (citing *MDPhysicians* ). That observation applies with equal force in the case at bar.

**(C) Did the franchisees' client employers establish or maintain single employer ERISA plans?**

Plaintiffs finally submit that even if the facts do not support their proffered conclusion that each franchisee formed a separate ERISA plan to which its clients subscribed, the facts do establish that each client company established a separate single employer ERISA plan. They then submit that as plan participants under the alleged single employer plans, or as parties in interest, they have a cause of action on behalf of these plans against McCarty for breach of fiduciary duty.

Again, ERISA defines the term "employee benefit plan" as "any plan, fund or program ... established or maintained by an employer or by an employee organization, or by both, for the purpose of providing its participants or their beneficiaries, through the purchase of insurance or otherwise, ... medical, surgical, or hospital care or benefits...." 29 U.S.C. § 1002(1). The parties agree that, consistent with Fifth Circuit criteria, a "plan" was established. *See Memorial Hosp. Sys. v. Northbrook Life Ins. Co.,* 904 F.2d 236, 240–41 (5th Cir.1990) (adopting *Donovan v. Dillingham,* 688 F.2d 1367, 1373 (11th Cir. 1982) (en banc) test for determining whether plan exists).[17] There further appears to be

---

**17.** In *Foxworth v. Durham Life Insurance Co.,* 745 F.Supp. 1227, 1229 (S.D.Miss.1990), this court quoted the test from *Donovan v. Dillingham,* 688 F.2d 1367, 1373 (11th Cir.1982) (en

no dispute that some of the subscribing employers, namely those which paid all or part of the premiums for their employees' coverage, established ERISA plans.[18] Others, though, and more specifically those whose employees paid the full cost of their own health benefits, were not ERISA plans. *See* 29 U.S.C. § 1135; 29 C.F.R. § 2510.3–1(j) (1987) (safe harbor regulation issued by Secretary of Labor excluding some plans from ERISA coverage).[19] Thus, some franchisees' individual client employers established single employer ERISA plans, and others did not.[20] However, it does not necessarily follow from the fact that some of the Jobmate franchisees' clients established ERISA plans that this court has jurisdiction under ERISA

since there is no proof that any of these plaintiffs' clients established an ERISA plan. All that is known is that *some* Jobmate franchisees' clients, and not necessarily clients of the franchisees that filed this lawsuit, established single employer ERISA plans. Thus, on the basis of the record as it currently stands, the court is unable to conclude that there is federal question jurisdiction.

Of greater concern to the court at this juncture is the fact that the plaintiffs' complaint in this cause was not premised on the existence of single employer plans but rather was based on their erroneous contention that the Jobmate plan itself was an ERISA plan. Both their complaint, and their motion for summary judgment, are founded on McCar-

---

banc), as follows: "[A] 'plan, fund, or program' under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." However, the fact that there is a plan does not mean it is an ERISA plan:

> To be an *"employee* welfare benefit plan," the intended benefits must be health, accident, death, disability, unemployment or vacation benefits, apprenticeship or other training programs, day care centers, scholarship funds, prepaid legal services or severance benefits; the intended beneficiaries must include union members, employees, former employees or their beneficiaries; and an employer or employee organization, or both, and not individual employees or entrepreneurial businesses, must establish or maintain the plan, fund, or program.

*Id.*

**18.** The court notes that while a statutory employer may establish or maintain a single employer employee benefit plan under ERISA by subscribing to a multiple employer trust, *see Memorial Hosp. System v. Northbrook Life Ins. Co.*, 904 F.2d 236 (5th Cir.1990), the courts in *MDPhysicians* and *Alliance Leasing* did not decide whether any of the subscribing employers directly established or maintained single employer employee welfare benefit plans covered by ERISA since that issue was not decided by the parties. *See MDPhysicians*, 957 F.2d at 182 n. 4 ("We do not decide 'whether each employer who subscribed to the [MDP] plan thereby established *its own individual* ERISA plan.'") (quoting *Credit Managers Ass'n v. Kennesaw Life and Accident Ins. Co.*, 809 F.2d 617, 625 (9th Cir.1987)); *Alliance Leasing*, 797 F.Supp. at 546 n. 1 ("We do not decide whether any of the "client companies' directly established or maintained 'single employer' employee benefit plans covered by ERISA.").

**19.** These regulations provide that the term "employee welfare benefit plan" does not include a group insurance program under which

> (1) No contributions are made by an employer or employee organization;
> (2) Participation [in] the program is completely voluntary for employees or members;
> (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
> (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3–1(j). Since "[t]he existence of any one of the four criteria listed in the regulation ... prevent[s] a group insurance plan, otherwise qualifying as an ERISA plan, from being excluded from coverage under the Act," *Memorial Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 241 n. 6 (5th Cir.1990), those clients who did not contribute to the cost of their employees' coverage did not establish ERISA plans.

**20.** Plaintiffs have stipulated that "in some instances one hundred percent (100%) of the cost of the health benefits was paid by the workers," yet argue that "[n]one of the plans espoused herein are saved from (ERISA) preemption by the Safe Harbor regulations for the following reasons: (1) contributions were made by employers...." It cannot reasonably be contended that ERISA plans were established in those instances in which the cost of coverage was shouldered entirely by the employee.

ty's duties, as an ERISA fiduciary, to the Jobmate plan, or Trust 2. A further concern is that plaintiffs filed this action as participants and parties in interest in the Jobmate plan; there is no allegation that they were participants in their clients' single employer plans, nor does it seem possible that they would so qualify. Nor have they alleged or shown that they are "parties in interest" in any of their clients' ERISA plans.[21] In other words, a serious question is presented as to these plaintiffs' standing to maintain this action under ERISA on the basis of the existence of single employer plans, as opposed to Trust 2 itself.

### III. PLAINTIFFS' REQUEST TO AMEND

The parties apparently agree that even if the court lacks federal question based on ERISA, the court would still have jurisdiction based on diversity of citizenship. McCarty, though, argues that even though the court may have diversity jurisdiction, there is no basis for the court's exercising that jurisdiction since the plaintiffs' complaint is based solely on alleged violations of fiduciary duties owed under ERISA. He further maintains that the plaintiffs' complaint fails to allege a viable claim under ERISA since they have "alleged 'fiduciary' status only with respect to the [Jobmate] plan, and not with respect to distinct plans possibly established by individual Subscribing Employers." *See MDPhysicians,* 957 F.2d at 182 n. 4. Plaintiffs, in apparent recognition of these facts, have asked that the court allow them to amend their complaint "consistent with this court's ruling on ERISA jurisdiction." The court assumes this means that plaintiffs desire to amend their complaint to allege either a cause of action based on the existence of single employer plans, or alternatively, some claim or claims against McCarty under state law. Under the circumstances, the court finds plaintiffs' request should be granted. Therefore, the court will allow plaintiff thirty days

from the entry of this opinion to file an amended complaint setting forth such claim or claims as they contend are properly cognizable by the court. However, inasmuch as plaintiffs' motion for summary judgment is premised solely on McCarty's alleged breach of fiduciary duties with respect to Trust 2, the motion will be denied since Trust 2 is not an ERISA plan. The court will likewise deny McCarty's cross-motion for summary judgment since it is based on the same premise. Should plaintiffs proceed in this cause by timely filing an amended complaint, though, the parties will be given adequate time within which to file such dispositive motions as they deem appropriate in light of any such amended pleading.

### IV. CONCLUSION

Based on the foregoing, it is ordered that plaintiffs' motion and defendants' cross-motion for summary judgment are denied. It is further ordered that defendants' supplemental motion for summary judgment is denied, and that plaintiffs shall have thirty days from this date within which to file an amended complaint consistent with this opinion.

---

**21.** The plan defines "participant" as "an eligible Employee who has executed an enrollment card or other applicable form and for whom coverage is in effect...." Obviously, the corporate plaintiffs cannot be participants, nor is there any allegation that the individual plaintiffs could be participants in their clients' ERISA plans. Moreover, a cursory review of ERISA's definition of the term "party in interest" does not readily disclose any category into which the franchisees fit as to their clients' single employer employee welfare plans. *See* 29 U.S.C. § 1002(14).