**FAG KUGELFISCHER GEORG SCHAFER KGaA, FAG Cuscinetti S.p.A., FAG (U.K.) Limited, Barden Corporation (U.K.) Limited, FAG Bearings Corporation and the Barden Corporation; Plaintiffs,**

v.

**UNITED STATES, Defendant,**

**Federal–Mogul Corporation; the Torrington Company, Defendant–Intervenors.**

Slip Op. 95–4.
Court No. 92–07–00487.

United States Court of
International Trade.

Jan. 17, 1995.

Grunfeld, Desiderio, Lebowitz & Silverman, Max F. Schutzman and Andrew B. Schroth, New York City, for plaintiffs, FAG Kugelfischer Georg Schafer KGaA, FAG Cuscinetti S.p.A., FAG (U.K.) Ltd., Barden Corp. (U.K.) Limited, FAG Bearings Corp. and The Barden Corp.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Marc E. Montalbine, Washington, DC, (Dean A. Pinkert, Attorney–Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, of counsel), for defendant.

Frederick L. Ikenson, P.C., Frederick L. Ikenson, J. Eric Nissley, Joseph A. Perna, V and Larry Hampel, Washington, DC, for defendant-intervenor, Federal–Mogul Corp.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, Wesley K. Caine, Myron A. Brilliant and Robert A. Weaver, Washington, DC, for defendant-intervenor, The Torrington Co.

## OPINION

TSOUCALAS, Judge:

Plaintiffs, FAG Kugelfischer Georg Schafer KGaA, FAG Cuscinetti S.p.A., FAG (U.K.) Limited, Barden Corporation (U.K.) Limited, FAG Bearings Corporation and The Barden Corporation (collectively "FAG"), producers, exporters and importers of ball bearings, cylindrical roller bearings and spherical plain bearings, challenge the affirmative determination by the Department of Commerce, International Trade Administration ("Commerce"), in *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; et al.; Final Results of Antidumping Duty Administrative Reviews ("Final Results")*, 57 Fed.Reg. 28,360 (1992) with respect to Germany and Italy.

This action is before the Court on plaintiffs' motion for judgment upon the agency record pursuant to Rule 56.2 of the Rules of this Court.

## Background

On May 15, 1989, Commerce published the antidumping duty orders which underlie this action. *Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings and Parts Thereof From the Federal Republic of Germany*, 54 Fed.Reg. 20,900 (1989); 54 Fed.Reg. 20,902 (1989) (France); 54 Fed.Reg. 20,903 (1989) (Italy); 54 Fed.Reg. 20,904 (1989) (Japan); 54 Fed.Reg. 20,906 (1989) (Romania); 54 Fed.Reg. 20,907 (1989) (Singapore and Sweden); 54 Fed.Reg. 20,909 (Thailand); *Antidumping Duty Orders and Amendments to the Final Determinations of Sales at Less Than Fair Value: Ball Bearings, and Cylindrical Roller Bearings and Parts Thereof From the United Kingdom*, 54 Fed.Reg. 20,910 (1989); 54 Fed.Reg. 20,911 (1989) (Thailand).

On June 28, July 19 and August 14, 1991, Commerce initiated administrative reviews of these orders with respect to various manufacturers and exporters for the period May 1, 1990 through April 30, 1991. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom; Initiation of Antidumping Administrative Reviews*, 56 Fed. Reg. 29,618 (1991); *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 56 Fed.Reg. 33,251 (1991); *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 56 Fed.Reg. 40,305 (1991).

On March 31, 1992, Commerce published its preliminary determinations in these second administrative reviews. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews*, 57 Fed. Reg. 10,859 (1992); 57 Fed.Reg. 10,862 (1992) (Federal Republic of Germany); 57

Fed.Reg. 10,865 (1992) (Italy); 57 Fed.Reg. 10,868 (1992) (Japan); 57 Fed.Reg. 10,871 (1992) (Romania); 57 Fed.Reg. 10,873 (1992) (Singapore); 57 Fed.Reg. 10,875 (1992) (Sweden); 57 Fed.Reg. 10,877 (1992) (Thailand); and 57 Fed.Reg. 10,878 (1992) (United Kingdom).

On June 24, 1992, Commerce published its consolidated Final Results. *Final Results,* 57 Fed.Reg. at 28,360. Amendments to the Final Results were published in *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom; Amendment to Final Results of Antidumping Duty Administrative Reviews,* 57 Fed. Reg. 32,969 (1992) and *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Sweden, and the United Kingdom; Amendment to Final Results of Antidumping Duty Administrative Reviews,* 57 Fed. Reg. 59,080 (1992).

Against this background, FAG now moves pursuant to Rule 56.2 of the Rules of this Court for judgment upon the agency record alleging that Commerce erroneously employed a methodology to calculate assessment rates for FAG's U.S. entries of German- and Italian-origin bearings which used entered values of sampled sales rather than actual entered values, although actual entered values were the best information available. *Memorandum of Plaintiffs FAG Kugelfischer Georg Schafer KGaA, FAG Cuscinetti S.p.A., and FAG Bearings Corporation in Support of FAG's Rule 56.2 Motion for Judgment Upon the Agency Record ("Plaintiffs' Brief")* at 1–23.

FAG alleges that Commerce's methodology for calculating assessment rates for FAG's U.S. entries of German- and Italian-origin bearings is unsupported by substantial evidence on the record and is not otherwise in accordance with law. *Plaintiffs' Brief* at 7.

**Discussion**

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a)(2) (1988) and 28 U.S.C. § 1581(c) (1988).

This Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed.Cir.1990).

*Assessment Rate Methodology for Entries of German and Italian Bearings*

Commerce's Final Results addressed the assessment rate methodology employed in this review, stating:

> For ESP [exporter's sales price] sales (sampled and non-sampled), we will divide the total PUDD [1] for the reviewed sales by the total entered value of those reviewed sales for each importer. We will direct Customs to assess the resulting percentage margin against the entered Customs values for the subject merchandise on each of that importer's entries under the relevant order during the review period.

*Final Results,* 57 Fed.Reg. at 28,362. Commerce explained:

> Section 751 of the Tariff Act requires that the Department calculate the amount by which the foreign market value exceeds the U.S. price and assess anti-dumping duties on the basis of that amount. However, there is nothing in the statute that

---

1. The calculation of PUDD (potential uncollected dumping duties) is a two step process. First, the amount of PUDD is determined for each U.S. sale by multiplying the per unit dollar margin for that sale (i.e., the per unit difference between the United States price ("USP") and the foreign market value ("FMV")) by the total number of items sold. Second, the PUDD for each of the U.S. sales is added to arrive at a total PUDD (TOT-PUDD).

dictates how the actual assessment rate is to be determined from that amount.

In accordance with section 751, the Department calculated the amount of the difference between FMV and USP (the dumping margin) for all reported U.S. sales. We have calculated assessment rates based on the total of these differences.... In ESP cases, the Department generally cannot tie sales to entries and therefore cannot link the amount of antidumping duties determined for any specific sale to the specific entry or entries of that same merchandise. In addition, determination of antidumping duties for every entry based on the sale of that merchandise is impossible where dumping margins have been based on sampling, even if sales could be tied to entries. Therefore, in order to achieve a fair assessment of antidumping duties based on the difference between FMV and USP for sales reviewed, we have expressed this difference as a percentage of the entered value of those sales for each exporter/importer. We will direct the U.S. Customs Service to assess antidumping duties by applying that percentage to the entered value of each of that importer's entries of subject merchandise under the relevant order during the review period.... We calculated these assessment rates on the basis of the ratio of the total value of antidumping duties, which is equal to the total amount of dumping margins, calculated for the examined sales to the total entered value of the sales used to calculate those duties.....

While the Department is aware that the entered value of sales during the POR [period of review] is not necessarily equal to the entered value of entries during the POR, use of entered value of sales as the basis of the assessment rate permits the Department to collect a reasonable approximation of the antidumping duties which would have been determined if the Department had reviewed those sales of merchandise actually entered during the POR.

*Final Results,* 57 Fed.Reg. at 28,375.

FAG argues that Commerce erred in calculating its antidumping duty assessment

rates for Italian and German product by dividing the total dumping duties due on sampled sales by the total entered values of those sampled sales, rather than by actual entered values from the POR. *Plaintiffs' Brief* at 2. As FAG had provided Commerce with actual entered values data for the entire POR, it objects to Commerce's use of sampling techniques to approximate entered values. *Id.* at 14. FAG contends that Commerce's failure to utilize its actual entered values was error as the actual values were the best evidence on the record for making its assessment rate calculations. FAG contends that Commerce's failure to incorporate actual entered values in its calculations will result in the collection of antidumping duties on FAG's POR entries which will exceed the amount of TOTPUDD calculated on FAG's reported sales. *Id.* at 5, 17. Relying on 19 U.S.C. § 1673e(a)(1) (1988),[2] FAG contends that Commerce may not collect more than the TOTPUDD it has calculated pursuant to its POR sales analysis. *Plaintiffs' Brief* at 19.

In order to avoid this alleged over-collection, FAG suggests that it would have been more appropriate and accurate for Commerce "to annualize the sampled TOTPUDD (by the 8.69 multiplier actually utilized by [Commerce], *i.e.,* 6 sampled weeks × 8.69 = 52.14 weeks, or 1 year)" and then "divide this amount by *actual* entry totals provided by FAG for the entire period of review." *Id.* at 12. FAG suggests that the "resulting assessment rate could then be applied to actual POR entries to collect TOTPUDD." *Id.*

Furthermore, FAG argues that many of the sampled sales-specific entered values reported by FAG cannot be linked to the entries that will be liquidated as a result of this review as some of the sampled ESP sales were for goods which were entered prior to, and subsequent to, the POR. *Id.* at 16. Thus, FAG contends that it is improper to utilize the entered values of sales made during the POR to establish assessment rates

---

2. **19 U.S.C. § 1673e. Assessment of duty**

**(a) Publication of antidumping duty order**
[T]he administering authority shall publish an antidumping duty order which—

(1) directs customs officers to assess an antidumping duty equal to the amount by which the foreign market value of the merchandise exceeds the United States price of the merchandise....

which will be applied to liquidation of entries made during the POR as the entered values on the sales analyzed by Commerce are unrepresentative of the entered values on FAG's POR entries. *Id.* at 16, 18.

In addition, FAG points out that Commerce knew the total size of the universe from which the sample was drawn. *Plaintiffs' Brief* at 14.

Commerce, however, cites *Koyo Seiko Co. v. United States*, 16 CIT 539, 796 F.Supp. 1526 (1992), *vacated in part*, 16 CIT 788, 806 F.Supp. 1008 (1992), and *GMN Georg Muller Nurnberg AG v. United States*, 17 CIT ——, Slip Op. 93–54, 1993 WL 129804 (April 20, 1993) ("*GMN*"), and argues that the assessment methodology it employed in this administrative review was identical to the methodology used in the first review and that methodology was judicially approved. *Defendant's Memorandum in Opposition to Plaintiffs' Motion for Judgment on the Agency Record ("Defendant's Brief")* at 7.

Commerce explains that it sampled approximately 10 percent of all ESP sales for reviewed companies having more than 2,000 such transactions. *Id.* It asserts that the assessment rate methodology it chose was the most accurate rate which still permitted Commerce the benefits of sampling. *Id.* at 9.

Defendant-intervenor, Federal–Mogul Corporation, a U.S. manufacturer of antifriction bearings ("AFBs"), argues that FAG's preferred alternative assessment methodology would empower FAG to influence and manipulate its assessment rates through inventory traffic control. *Response of Federal–Mogul Corporation, Defendant–Intervenor, to Plaintiffs' Motion for Judgment Upon the Agency Record* at 2.

Defendant-intervenor, The Torrington Company, a U.S. producer of AFBs, asserts that there is no basis on the administrative record for concluding that FAG's recommended assessment rate method would yield more accurate results than Commerce's method. *Response of The Torrington Company, Defendant–Intervenor, in Opposition to Motion of FAG Kugelfischeer Georg Schafer, KGaA, et al., Plaintiffs, for Judgment Upon the Agency Record* at 5.

Title 19, United States Code, section 1673e(a)(1) pertains to the application of assessment rates by the Customs Service in furtherance of Commerce's assessment determinations. The only statutory provision which specifically refers to the actual assessment of antidumping duties appears in 19 U.S.C. § 1675(a)(1)(B) (1988). This provision provides that Commerce shall "review, and determine (in accordance with paragraph (2)), the amount of any antidumping duty." Paragraph 2 of section 1675(a), explains that the amount by which the FMV exceeds the USP "shall be the basis for the assessment of antidumping duties on entries of the merchandise included within the determination." 19 U.S.C. § 1675(a)(2) (1988). In the case at bar, as required by statute, Commerce calculated dumping margins based on the difference between FMV and USP and this differential was the basis for the assessment of antidumping duties. Commerce used the entered value only to allocate, to each entry, a portion of the antidumping duties due.

The reviews of German- and Italian-origin product were among a total of nine reviews occurring simultaneously and covering sixty-three manufacturers/exporters. *Final Results*, 57 Fed.Reg. at 28,360. Under the circumstances, for companies with enormous volume of ESP transactions, it was not unreasonable for Commerce to utilize the sampling techniques which are authorized by 19 U.S.C. § 1677f–1 (1988). In addition, the information relating to FAG's sales which Commerce used in its sampling analysis was supplied by FAG.

In previously sustaining Commerce's current assessment methodology, the Court stated:

It is well-established that Commerce is granted tremendous deference in selecting the appropriate methodology.... As long as Commerce's "decision is reasonable, then Commerce has acted within its authority even if another alternative is more reasonable." *See Koyo Seiko Co. v. United States*, 16 CIT ——, ——, 796 F.Supp. 517, 523 (1992)....

In this case Commerce's methodology is a reasonable means of achieving the end

result and, therefore, Commerce's actions are justified and in accordance with law. *Koyo Seiko Co.*, 16 CIT at 541–42, 796 F.Supp. at 1529; *see also GMN Georg Muller Nurnberg AG*, 17 CIT at ——, Slip Op. 93–54 at 5, 1993 WL 129804 at *2. In *GMN*, however, the Court stated:

> Plaintiff claims that the "better" way for Commerce to have acted would have been for it to calculate the assessment rates based on the ratio of total dumping duties owed to the *total* entered value of the subject merchandise during the period of review. Commerce, however, could not have followed this method for two reasons. First, Commerce was unaware of the size of the universe from which the sample was drawn. Second, Commerce did not have information about the total entered value of units entered during the review period. Thus, Commerce was forced to use sampling techniques and use the sales data they had.

*GMN George Muller Nurnberg AG*, 17 CIT at ——, Slip Op. 93–54 at 4–5, 1993 WL 129804 at *2. In this case, Commerce states, "[w]hile Commerce had FAG's entered values for the merchandise entered during the review period, Commerce was not aware of the size of the universe from which the sample was drawn." *Defendant's Brief* at 11.

Commerce also contends that its assessment methodology assumed a constant rate of dumping throughout the POR and did not predetermine a total amount of duties to be collected. *Id.* at 11–12. Commerce points out that, in contrast, FAG's recommended method assumes a constant rate of sales made during the period of review, thus generating what can be characterized as an estimated TOTPUDD. *Id.* at 11. Commerce further contends that it could not avoid a simplifying assumption about the rate of dumping of all entries during the POR, stating:

> A theoretician might hypothesize that Commerce could have taken the sample PUDD and multiplied it by a number calculated to compensate for the size of the sample relative to the size of the universe of sales from which the sample was drawn. By dividing this number by the total entered value of units entered during the period, one could derive an assessment rate that embodies no assumptions regarding entries that were not sold during the period of review. *However, Commerce could not follow this more refined method because it did not know the size of the universe from which the sample was drawn and could not determine that size without imposing reporting requirements that would have defeated the purpose of sampling.*

*Defendant's Brief* at 9 (emphasis added). Commerce also argues, "[i]f the sample was drawn from **sales** during the period of review, then information concerning **entries** during the period of review could not possibly assist Commerce in determining the universe from which the sample sales were drawn." *Id.* at 11. However, the administrative record contains FAG's data on actual entered values, as well as on total sales, for German- and Italian-origin product. *Italy AR (Pub.) Doc. 57 at 1338; Germany AR (Pub.) Doc. 194, Exhibit 6.* Hence, there is a discrepancy between Commerce's statements and the contents of the administrative record.

In light of the question that *GMN* leaves unanswered about the propriety of Commerce's current methodology in a situation where Commerce knows both the size of the universe from which it draws its sample and the total entered value of entries during the POR, the Court remands this case to Commerce. Commerce is to determine whether, taking into account FAG's data on total sales and actual entered values, its assessment rate methodology for entries of German- and Italian-origin bearings was the most accurate possible which met the needs and achieved the benefits of sampling analysis, such that the methodology employed in this review was a reasonable exercise of agency discretion.

## Conclusion

FAG's motion for judgment upon the agency record is granted to the extent that this case is remanded to Commerce to determine whether, considering FAG's data on the record pertaining to total sales and actual entered values, its assessment rate methodology for entries of German- and Italian-origin

bearings was the most accurate possible which met the needs and achieved the benefits of sampling analysis.

The remand results are due within ninety (90) days of the date that this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter; and any rebuttal comments are due within fifteen (15) days of the date that responses or comments are due.

## ORDER

This case having been duly submitted for decision following plaintiffs' motion for judgment on the agency record, and the Court, after due deliberation, having rendered a decision herein; now, therefore, in accordance with said decision,

**IT IS HEREBY ORDERED** that plaintiffs' motion is granted to the extent that this case is remanded to the Department of Commerce, International Trade Administration, to determine whether, considering FAG's data on the record pertaining to total sales and actual entered values, its assessment rate methodology for entries of German- and Italian-origin bearings was the most accurate possible which met the needs and achieved the benefits of sampling analysis; and it is further

**ORDERED** that the remand results are due within ninety (90) days of the date that this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter; and any rebuttal comments are due within fifteen (15) days of the date responses or comments are due.